**GENERAL ELECTRIC COMPANY,**
**Appellant,**

v.

**CALIFORNIA INSURANCE GUARANTY ASSOCIATION, Delaware Insurance Guaranty Association, Illinois Insurance Guaranty Fund and Tennessee Insurance Guaranty Association, Appellees.**

**No. 09–97–481 CV.**

Court of Appeals of Texas,
Beaumont.

Submitted May 20, 1999.

Decided Aug. 31, 1999.

Rehearing Overruled Oct. 21, 1999.

Robert Q. Keith, Amy Keith, Keith & Weber, Johnson City, Dennis P. Monaghan, McCarter & English, LLP, Newark, NJ, for appellant.

Millard A. Johnson, Laura A. Cook, Johnson, Finkel & DeLuca, Houston, for appellee.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from the trial court's granting of special appearances filed by each of the four appellees. The special appearances complained of the lack of *in personam* jurisdiction. Appellees consist of the California Insurance Guarantee Association (CIGA), Delaware Insurance Guaranty Association (DIGA), Illinois Insurance Guaranty Fund (IIGF), and the Tennessee Insurance Guaranty Association (TIGA). For simplification we shall refer to appellees collectively as the Guaranty Funds. Initially, appellant, General Electric Company (G.E.) filed an original action seeking a declaratory judgment that appellees, among others, be obligated to defend and/or indemnify G.E. against third-party asbestos claims due to the fact that certain of G.E.'s primary insurers had become insolvent. Following the granting of the special appearances, that portion of the lawsuit was severed from the remainder of the litigation and this appeal was prosecuted.

The Guaranty Funds' special appearances were submitted separately to the trial court. In support of each special appearance, the record before us contains a copy of the enabling legislation from each of the four states and an affidavit from a representative of each states' guaranty fund. Each of the Guaranty Funds also submitted answers to interrogatories per requests from G.E. An examination of the record before us indicates that G.E. provided no evidence in the form of testimony or affidavits contradicting any of the factual assertions made by each of the Guaranty Funds' representatives. G.E. did file a variety of sworn pleadings and oppositions to the various special appearances. Generally, however, pleadings are not competent evidence, even if sworn or verified. *Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex.1995); *Hidalgo v. Surety Sav. & Loan Ass'n*, 462 S.W.2d 540, 545 (Tex.1971). As such, we initially observe that the evidence in support of the Guaranty Funds' special appearances is before us uncontested.

■ While we have stated that the standard for review of a trial court's decision regarding a plea to the jurisdiction is that of factual sufficiency, *see Cadle v. Graubart*, 990 S.W.2d 469, 471 (Tex.App.— Beaumont 1999, no pet.), if a special appearance is based on undisputed or otherwise established facts, an appellate court shall conduct a *de novo* review of the trial court's order granting the special appearance. *Conner v. ContiCarriers and Terminals, Inc.*, 944 S.W.2d 405, 411 (Tex. App.—Houston [14th Dist.] 1997, no writ). A careful examination of G.E.'s responsive pleadings in opposition to the special appearances will indeed indicate an alleged assertion of "fact" to the effect that the Guaranty Funds stand in the shoes of their insolvent insurers for all purposes, including *in personam* jurisdiction. As we will clarify later, this assertion by G.E. is not a fact established of record but a question of law to be determined by the courts.

At this point we emphatically state that the scope of this appeal is limited to the issue of the propriety of exercising personal jurisdiction over the nonresident defendants only. We shall not address the concept of "covered claims" or what persons or entities may or may not be subject to "covered claims." Based upon the affidavits from their respective representatives, as well as the language of each state's enabling legislation, we recognize that the Guaranty Funds are unincorporated associations created by statutes promulgated by each Guaranty Fund's respective state legislature.[1] The apparent purpose for the creation of each of these Guaranty Funds

---

1. *See* CAL. INS.CODE §§ 1063–1063.16 (West 1997); DEL.CODE ANN. tit. 18, §§ 4201–23 (1975–1996); 215 ILL. COMP. STAT. ANN. 5/532– 53 (West 1997); TENN.CODE ANN. §§ 56–12– 101—56–12–220 (1971–1989).

is to provide protection for certain statutorily designated claimants in the event of the insolvency of certain statutorily designated insurers. All fifty states currently have enacted legislation creating property and casualty insurance guaranty associations patterned wholly or in large part after the National Association of Insurance Commissioners "Post–Assessment Property and Liability Insurance Guaranty Association Model Act" (Model Act). This is the extent of our discussion of the historical bases of the Guaranty Funds.

## THE LAW OF PERSONAL JURISDICTION

■ A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Texas long-arm statute are satisfied. *See* U.S. CONST. amend. XIV, § 1; *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404, 410–11 (1984); *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996). The long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant that does business in Texas. *CSR Ltd.*, 925 S.W.2d at 594. In addition to a discrete list of activities that constitute doing business in Texas, the statute provides that "other acts" by the nonresident can satisfy the requirement. *Id.; Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991); TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Vernon 1997). The Texas Supreme Court has repeatedly interpreted this broad statutory language "to reach as far as the federal constitutional requirements of due process will allow." *CSR Ltd.*, 925 S.W.2d at 594; *Guardian Royal*, 815 S.W.2d at 226; *U–Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex.1977). Consequently, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *CSR Ltd.*, 925 S.W.2d at 594.

In *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), we find a very detailed discussion of the scope of due process *vis-a-vis* the exercise of personal jurisdiction over a nonresident defendant. We quote liberally from the case:

> "[T]he constitutional touchstone" of the determination whether an exercise of personal jurisdiction comports with due process "remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945). Most recently we have reaffirmed the oft-quoted reasoning of *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), that minimum contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. [citation omitted] "Jurisdiction is proper ... where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." [citations omitted]
>
> . . . .
>
> The "substantial connection," [citations omitted] between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.* [citations omitted] The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing

channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi Metal Industry Co.,* 480 U.S. at 108–09, 112, 107 S.Ct. at 1030, 1032, 94 L.Ed.2d at 102, 104. [emphases in original]

■ In the instant case, there exists no evidence of any actions by any of the Guaranty Funds directed toward Texas. The evidence before us clearly establishes that none of the Guaranty Funds do any business in Texas. They have no offices in Texas; they have no property in Texas; they do not advertise in Texas or otherwise solicit any business in Texas. Indeed, based upon their respective enabling legislation, we find that the Guaranty Funds are not in "business" at all, as that term is generally understood in the world of commercial enterprise. Typical of the evidence before us is contained in the following portion of the affidavit of Lawrence E. Mulryan, Executive Director of the California Insurance Guarantee Association. Mr. Mulryan's affidavit contains the following facts:

2. CIGA is not an insurance company and is not licensed as an insurance company in Texas or in any other state. CIGA does not issue insurance policies and is not a party to any insurance contract issued by an insolvent insurer. CIGA does not now have and has never had any policyholders. Member insurers of CIGA are not themselves authorized to act on behalf of CIGA. CIGA is not the agent of its member insurers. It does not act on its member insurers behalf, nor does it control the activities of its member insurers with respect to their conduct of their insurance business.

3. Contrary to the allegations of [paragraph] 69 of the Petition, CIGA is not authorized and has not been authorized to do business in Texas.

4. Contrary to the allegations of [paragraph] 69 of the Petition, CIGA has not transacted business within the State of Texas by doing a series of acts in Texas for the purpose of realizing pecuniary benefit, contracting to supply services in Texas, or contracting to insure or insuring, or all of these, for the benefit of persons, property or risks located within Texas, or otherwise.

5. CIGA has taken no voluntary action to avail itself of the privilege of conducting activities in Texas.

6. CIGA has never been incorporated in Texas.

7. CIGA has never appointed an agent for service of process in Texas.

8. CIGA does not have and has never had any agents, officers, employees, assets, bank accounts or property of any kind in Texas.

. . . .

10. CIGA has no record of any contract of any nature whatsoever between it and any resident of Texas.

11. CIGA has never directed any advertising to the State of Texas.

12. None of CIGA's management personnel reside or are domiciled in Texas.

13. CIGA has no employees residing or domiciled in Texas.

14. CIGA maintains no office in the State of Texas.

15. CIGA has no telephone listings or mailing addresses in the State of Texas.

16. CIGA does not pay taxes to the State of Texas.

17. CIGA has not initiated any litigation in the state [sic] of Texas.

18. CIGA has not by any act or deed consented nor has it agreed to consent to jurisdiction in the State of Texas.

. . . .

20. CIGA does not own, lease or possess any real or personal property of any kind in the State of Texas.

As alluded to above, the gist of G.E.'s argument in the trial court, and on appeal, is that the Guaranty Funds "stand in the shoes" of the insolvent member insurers for purposes of personal jurisdiction because through the activities of said insurers the Guaranty Funds have engaged in sufficient minimum contacts with Texas to permit the exercise of personal jurisdiction. As authority for this proposition, G.E. relies heavily on *Olivier v. Merritt Dredging Co., Inc.,* 979 F.2d 827 (11th Cir.1992). We find the *Olivier* court's analysis of the personal jurisdiction flawed in that, in our opinion, *Olivier* mistakenly interweaves the personal jurisdiction issue with the "covered claims" issue.[2] At least in the present case, we believe that any findings or decisions made with regard to "covered claims" would be premature, resulting in an advisory opinion. As we appreciate the instant appeal, our *only* determination is whether the district court was correct in finding it had no personal jurisdiction over the Guaranty Funds. Only when a trial court has personal jurisdiction over the parties, as well as subject-matter jurisdiction, is it thereafter *authorized* to act on the substantive matters of the litigation before it. In the instant case, the question of who has or does not have "covered claims" based upon the respective guaranty acts is a substantive issue not before us at this time. A close reading of *Olivier* indicates that the issue was not before the Eleventh Circuit either.

A second flaw we find in *Olivier* is its rather bold pronouncement, without any supporting authority, that "[a] member of the [guaranty] association, acting within the framework of the Interstate compact[3] who becomes insolvent, automatically makes the association the alter ego of that failed member." *Id.* at 832. The Eleventh Circuit does not explain the legal or factual basis for this transformation, or why it "automatically" occurs when a member insurer becomes insolvent other than the apparent holding that a guaranty association always "stands in the shoes" of the insolvent insurer as a matter of law.

A more reasoned approach to the personal jurisdiction issue was posited by the Austin Court of Appeals in *Texas Property and Cas. Ins. Guar. Ass'n v. Boy Scouts of America,* 947 S.W.2d 682 (Tex.App.—Austin 1997, no writ).

In contrasting the above-discussed holding in *Olivier,* the Court in *Boy Scouts* cited cases from Florida and California for the proposition that because the statutory obligations of a guaranty association are substantive obligations of supplying limited amounts of funds under limited circumstances and do not amount to a guaranty association's consent to another state's personal jurisdiction, a guaranty association stands in the shoes of an insolvent insurer for only "some" limited purposes. *Id.* at 687 (citing *Georgia Insurers Insolvency Pool,* 602 So.2d 1264, 1267 (Fla. 1992); *Pennsylvania Life & Health Ins. Guar. Ass'n,* 22 Cal.App.4th 477, 27 Cal. Rptr.2d 507, 513 (1994)). The Austin Court observed that the Florida and California cases reasoned that because guaranty associations' liabilities are "strictly limited to statutorily defined covered claims," the obligations of guaranty associations are not necessarily coextensive with the insolvent insurer. *Id.* As regards the "standing in the shoes" sub-issue of our personal jurisdiction inquiry, this approach recognized by the Austin Court is eminently more reasonable than the somewhat simplistic, slap-dash method of declaring a

---

**2.** "Furthermore, Olivier argues that since his claim is a 'covered claim,' according to the respective statutes, LIGA and SCIGA are deemed insurers to the extent of Midland's [the insolvent insurer] obligations.... We agree with Olivier's position." *Id.* at 831.

**3.** We have scoured the *Olivier* opinion for the source of the term "Interstate compact" and

have been unable to locate its source or origins. If this language is meant to indicate that the Eleventh Circuit believed that all of the various states' guaranty acts are somehow tied together by some sort of "interstate compact," we cannot ascribe to this belief as there has been presented absolutely no evidence or authority to us in support of such a proposition.

guaranty association the "agent" or "alter ego" of the insolvent insurer *for personal jurisdiction purposes* because, apparently, the insolvent insurer participates in the insurance guaranty fund process. We therefore adopt the observations of the Austin Court and also hold that a guaranty association does not "stand in the shoes" of an insolvent insurer for purposes of personal jurisdiction. Based upon this holding as well as the record before us, we find an entire lack of evidence to indicate that the Guaranty Funds have ever had any minimum contacts with the State of Texas. This includes a lack of evidence to indicate contacts that would support either general or specific jurisdiction. *See CSR Ltd.*, 925 S.W.2d at 595.

■ We recognize that although foreseeability is a factor to consider in a minimum contacts analysis, foreseeability alone will not support personal jurisdiction. *Id.; Guardian Royal*, 815 S.W.2d at 227. As stated in *Asahi*, the nonresident defendant must take an action *"purposefully directed"* toward the forum state to be subject to the jurisdiction of its courts. *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104. In the instant case, assuming as true that the respective Guaranty Funds had knowledge of the out-of-state business practices of the insolvent insurers, the record before us contains no evidence that the Guaranty Funds *themselves* took any actions "purposefully directed" toward Texas. There is simply no evidence that the Guaranty Funds "intended to serve the Texas market." *CSR Ltd.*, 925 S.W.2d at 595.

■ We now turn to the second prong of the personal jurisdiction inquiry, that personal jurisdiction must comport with fair play and substantial justice. *See Asahi*, 480 U.S. at 113, 107 S.Ct. at 1032–33, 94 L.Ed.2d at 105; *Guardian Royal*, 815 S.W.2d at 231. In this inquiry, it is incumbent that a defendant present a compelling case that the presence of some consideration would render jurisdiction unreasonable. *Guardian Royal*, 815 S.W.2d at 231. In the instant case, the interests of G.E. and Texas in Texas's assertion of jurisdiction over the Guaranty Funds is slight. G.E. is merely seeking indemnification and/or a declaratory judgment that G.E.'s insurers are obligated to defend it against third-party asbestos claims. An indemnification claim against a nonresident defendant was recognized by the Court in *Asahi* as providing the forum state with little interest in such litigation. *See Asahi*, 480 U.S. at 114, 107 S.Ct. at 1033, 94 L.Ed.2d at 106.

Furthermore, G.E. readily admits that some of the third-party claims "have been asserted by persons who were residents of California, Delaware, Illinois and Tennessee at the time of their alleged asbestos exposure." How are Texas's interests implicated under this scenario? G.E. further contends that Texas's interest in the instant lawsuit is significant because "[w]hile this coverage action encompasses asbestos-related claims asserted throughout the United States, the largest number of subject claims have been brought in Texas." G.E. does not argue all these claims involved Texans. All this factually unsupported statement seems to indicate is that Texas has, once again, become the favorite forum for a multitude of nonresident plaintiffs whose causes of action originated out-of-state. The State's interest in this specific type of litigation is exceedingly low. *See Owens Corning v. Carter*, 997 S.W.2d 560, 582 – 83 (1999).[4] Considering all of the above, the substantial burden on the Guaranty Funds and the rather slight in-

---

4. ("The Legislature reasonably believed that Texas's resources were better spent on cases having a more substantial relation to Texas, and that Texas residents were being denied access to their own courts because of a backlog of cases the Legislature reasonably believed should be litigated elsewhere. The purpose of Senate Bill 220 was to remove the asbestos exception from section 71.051 [Civil Practice & Remedies Code] and to discourage forum shipping by all out-of-state plaintiffs with claims arising in another state by adopting the borrowing statute. Certainly, these are legitimate state interests.")

terests of G.E. and the almost non-existent interests of Texas as the forum state indicates that the exercise of personal jurisdiction of a Texas state district court over the Guaranty Funds would be unreasonable and unfair.

In Texas, a nonresident defendant must negate all bases of personal jurisdiction to prevail in a special appearance. *See CSR Ltd.*, 925 S.W.2d at 596. In applying the two-prong test for personal jurisdiction set out by the United States Supreme Court to the evidence contained in the record before us, we conclude that each of the respective Guaranty Funds has carried its burden to negate all bases of personal jurisdiction. We overrule G.E.'s appellate issues and affirm the orders of the trial court which granted the Guaranty Funds' special appearances.

AFFIRMED.

EARL B. STOVER, Justice, concurring.

"The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 62 L.Ed.2d 490, 497 (1980). To this end, principles or requirements have evolved which help to define exactly what type of conduct constitutes minimum contacts as a basis for personal jurisdiction. Based on federal constitutional requirements, the Texas Supreme Court has clarified a jurisdictional formula or "checklist" to determine if a court's exercise of jurisdiction is consistent with due process. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230–31 (Tex.1991). Chief Justice Walker, author of the majority opinion, has adequately and ably reviewed the two federal due process requirements of personal jurisdiction—(1) minimum contacts and (2) fair play and substantial justice. I choose to direct my attention to the foreseeability component of the minimum contacts analysis as well as the fair play and substantial justice requirement.

As stated by the Texas Supreme Court in *Guardian Royal*, "the concept of 'foreseeability' is implicit in the requirement that there be a 'substantial connection' between the nonresident defendant and Texas arising from action or conduct of the nonresident defendant purposefully directed toward Texas." *Id.* at 227. Stated another way, the activities of the nonresident defendant "must justify a conclusion that the defendant should reasonably anticipate being called into court there." *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990) (citing *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. 559). "'Foreseeability' is especially pertinent when the nonresident defendant is an insurance company." *Guardian Royal*, 815 S.W.2d at 227.

> [W]hen the nonresident defendant is an insurance company, the following factors, when appropriate, should be considered when determining whether the nonresident defendant has purposely established "minimum contacts" with the forum state: (a) the insurer's awareness that it was responsible to cover losses arising from a substantial subject of insurance regularly present in the forum state; and (b) the nature of the particular insurance contract and its coverage.

*Id.* Because this appeal involves a personal jurisdiction analysis of guaranty associations, a distinctive form of insurance, factor (b) as listed above, is especially pertinent to our consideration.

CIGA, DIGA, IIGF and TIGA are entities created by the state legislatures of California, Delaware, Illinois, and Tennessee. The statutory purpose of these guaranty funds is to provide a limited form of protection for *policyholders* and *claimants* residing in these states in the event of the insolvency of certain insurers. The existence of guaranty funds and the extent of their statutory obligation to their resident claimants, if any, depends exclusively upon the law of the state creating the guaranty association. Pursuant to express statutory language, the guaranty fund's obligations

are not, in all respects, co-extensive with that of the insolvent insurer. For example, although the insolvent insurer might be bound to pay its full policy limits for a particular claim, the enabling statute of each guaranty fund contains a monetary cap on the guaranty fund's liability to each claimant. Also, some statutes provide that a guaranty fund may not pay a claimant at all if the insured has a high net worth.

It would be fundamentally unfair to allow Appellant to hale these Appellee guaranty funds into a Texas court, only to ask the court to adjudicate the extent of the protections afforded under California, Delaware, Illinois, and Tennessee law for residents of those states—protections which are paid for by residents of those states. This conclusion is supported by the fact that the guaranty funds perform limited functions, their statutory schemes require *intra* state contacts (within the state enacting the particular guaranty fund) before the guaranty funds become involved, and the states have an important interest in conserving the guaranty fund's limited funds by avoiding the increased costs of litigation in other states. In addition, while the drafters of the enabling legislation creating the Texas guaranty fund were possibly more astute in including a specific provision denying long-arm jurisdiction, I do not feel that the omission of such a provision by legislation of other states should be construed as an implied consent to jurisdiction.

Some private commercial insurance companies offer customers broad-based coverage; these customers, in turn, pay higher premiums. Obviously, substantial financial benefits may accrue to companies which offer such policies. In such a situation, a non-resident defendant corporation could reasonably anticipate being called into a court of the forum state. However, a guaranty fund is not a commercial insurance company offering broad based coverage. These guaranty funds did not agree to provide coverage for acts occurring in Texas. Under Appellant's theory, the guaranty funds "stepped into the shoes" of their insolvent insurers for purposes of jurisdiction.[5] However, as noted by the majority opinion, the record before us contains no evidence that the Appellee guaranty funds themselves took any action purposely directed toward Texas or intended to serve the Texas market.

Finally, the exercise of jurisdiction cannot offend traditional notions of fair play and substantial justice.[6] As discussed in *Guardian Royal*, the "State of Texas has a special interest in regulating certain areas such as insurance[.]" *Id.* at 229. "However, a state's regulatory interest alone is not in and of itself sufficient to provide a basis for jurisdiction." *Id.* In my view, under these facts and circumstances, an assertion of personal jurisdiction over the guaranty funds would be unreasonable and would not comport with fair play and substantial justice.

DON BURGESS, Justice, dissenting.

I respectfully dissent. The majority rejects the "stand in the shoes" argument and refuses to delve into the issue of "covered claims." I believe they are wrong on both accounts. The practical effect of the majority's analysis is to say these guaranty funds can be sued only in their home states. Clearly the funds do not act as ordinary insurers, therefore they would not have any minimum contacts outside their own state until an insurer becomes insolvent. Arguably, the guaranty funds

---

5. I acknowledge the scholarly "standing in the shoes" analysis by our veteran Judge Burgess, but it reminds me of a statement made by General Colin Powell. In response to former president Reagan's theory that people should pull themselves up by their own bootstraps, Colin Powell remarked that you must first have boots before you can pull. In similar fashion, I fail to find any "shoes" for these insurance companies to stand in. Accordingly, I do not believe they can be bootstrapped into the jurisdiction of the Texas courts.

6. Our distinguished Chief Justice, Ronald L. Walker, an east Texas sage who is rapidly becoming a legend in his own time, has a rule called "'t'aint fair." Here, I find myself adopting that rule.

might establish some minimum contacts through the claims process, but that is highly unlikely.

Unlike the majority, I believe the analysis in *Olivier v. Merritt Dredging Co.*, 979 F.2d 827, 829 (11th Cir.1992) is not flawed in any respect. In *Olivier*, the Eleventh Circuit held that the Louisiana Insurance Guaranty Association and the South Carolina Property and Casualty Insurance Guaranty Association were subject to personal jurisdiction in the State of Alabama. *Id.* at 835. Like the IGAs in this case, LIGA and SCIGA had no offices, no agents and no activities in Alabama and asserted they lacked minimum contacts with Alabama sufficient to support personal jurisdiction. *Id.* at 832. The *Olivier* court explicitly rejected this argument. *Id.* Instead, the court found that these associations stand in the shoes of their insolvent insurer members with respect to "covered claims" and, because the insol-

vent insurer at issue had "minimum contacts" with Alabama, LIGA and SCIGA also had sufficient contact such that they should have reasonably foreseen that they would be subject to suit in Alabama. *Id.* at 833.[7]

Contrary to the majority's assertion that the *Olivier* court did not explain itself, the explanation is in the statutes themselves. The IGAs' enabling statutes explicitly require these associations to stand in the shoes of their insolvent members for purposes of personal jurisdiction. Delaware's enabling statute, for example, provides that DIGA shall be "deemed the insurer ... [and] have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent." DEL. CODE ANN. § 4208(a)(2).[8] California, Illinois and Tennessee have enacted virtually identical statutes. CAL. INS.CODE § 1063.2(b);[9] 215 ILCS § 5/537.4;[10] TENN.CODE ANN. § 56–12–107(2).[11] Re-

7. In addressing the issue of "foreseeability," the *Olivier* court specifically noted that, in forming the state insurance guaranty associations to avoid federal legislation creating a national guaranty fund, the insurance industry had to anticipate that the guaranty associations would be haled into the same courts where their insolvent members would have been subject to the reach of due process. *Id.* at 833.

8. DEL.CODE ANN. tit. 18, § 4208(a)(2) (1996) states:
§ 4208. Powers and duties of the Association
(a) The Association shall:
(2) Be deemed the insurer to the extent of its obligation on the covered claims and, to such extent, shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent.

9. CAL. INS.CODE § 1063.2(b) (West 1997) states:
§ 1063.2. Covered claims; duties; priority of claims
(b) The association shall be a party in interest in all proceedings involving a covered claim, and shall have the same rights as the insolvent insurer would have had if not in liquidation, including, but not limited to, the right to: (1) appear, defend, and appeal a claim in a court of competent jurisdiction; (2) receive notice of, investigate, adjust, compromise, settle, and pay a covered claim; and (3) investigate, handle, and deny a noncovered

claim. The association shall have no cause of action against the insureds of the insolvent insurer for any sums it has paid out, except as provided by this article.

10. 215 ILL. COMP. STAT. ANN. 5/537.4 (West 1997) states:
5/537.4. Fund assumes obligations of insolvent companies
§ 537.4. Fund assumes obligations of insolvent companies. The Fund shall be deemed the insolvent company to the extent of the Fund's obligation for covered claims and to such extent shall have all rights, duties, and obligations of the insolvent company, subject to the limitations provided in this Article, as if the company had not become insolvent, with the exception that the liquidator shall retain the sole right to recover any reinsurance proceeds. The Fund's rights under this Section include, but are not limited to, the right to pursue and retain salvage and subrogation recoveries on paid covered claim obligations to the extent paid by the Fund.

11. TENN.CODE ANN. § 56–12–107(a)(2) states:
**56–12–107. Powers and duties of association.—** The association shall:
(2) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent;

quiring the IGAs to stand in the shoes of their insolvent members, even when those shoes take them to foreign jurisdictions, is consistent with the stated purpose of these IGAS, which is:

> to provide a mechanism for the payment of covered claims ... to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, ...

TENN.CODE ANN. § 56–12–102; *see* DEL. CODE ANN. § 4202; 215 ILCS § 5/532. Compare the Texas statute which negates the "stand in the shoes" doctrine and specifically mentions long arm jurisdiction.[12]

Other Courts from around the country concur that guaranty associations stand in the shoes of their insolvent members for purposes of jurisdiction. Specifically, the South Carolina Supreme Court held that, with respect to "covered claims," Georgia's guaranty fund stood in the shoes of its member insurers with regard to jurisdiction and, thus, could be haled into court in South Carolina based on an insolvent member's contacts with the state. *Bell v. Senn Trucking Co.*, 308 S.C. 364, 418 S.E.2d 310, 312 (1992). The Alaska Supreme Court likewise found that the insurance guaranty association for the State of Washington stood in the shoes of one of its insolvent members for purposes of establishing jurisdiction in Alaska. *Washington Ins. Guar. Ass'n v. Ramsey*, 922 P.2d 237, 242 (Alaska 1996).[13] In affirming jurisdiction, the Court noted that "[n]umerous courts have held that the act of guaranteeing an obligation in the forum state alone is a sufficient contact to establish jurisdiction." *Id.* The New Jersey Appellate Division similarly held that the Pennsylvania Insurance Guaranty Association ("PIGA") stood in the shoes of its insolvent carrier members and because these companies could be joined, the Guaranty Association could similarly be joined in a New Jersey law suit. *Ruetgers–Nease Chem. Co. v. Firemen's Ins. of Newark,* 236 N.J.Super. 473, 566 A.2d 227, 229 (Ct.App.Div.1989). Pertinent to the instant case, the *Ruetgers–Nease* court found that PIGA "stands in the shoes of the insolvent carriers and is liable to the plaintiff under their policies to the same extent the insolvent carriers were" and such "coverage extends to claims, wherever located, if the claimant is a Pennsylvania resident." *Id.*

The majority believes *Texas Property and Cas. Ins. Guar. Ass'n v. Boy Scouts of America,* 947 S.W.2d 682 (Tex.App.—Austin 1997, no writ) is a more reasoned approach. The *Boy Scouts* case is factually distinguishable and its legal conclusions are not binding on this Court. The *Boy Scouts* case involved a coverage action brought by a resident of Pennsylvania seeking coverage for third-party claims brought solely by residents of Pennsylvania and arising out of events which took place entirely in Pennsylvania. *Id.* at 688.

**12.** TEX. INS.CODE ANN. art. 21.28–C, § 8(b) (Vernon Supp.1999) states:

> **Powers and duties of association**
> Sec. 8.....
> (b) The association shall undertake to discharge the policy obligations of the impaired insurer, including the duty to defend insureds under a liability policy, to the extent that the policy obligations are covered claims under this Act. In performing its statutory obligations, the association may also enforce any duty imposed on the insured party or beneficiary under the terms of any policy of insurance within the scope of this Act. In performing its statutory obligations under this Act, the association shall not be considered to be in the business of insurance, shall not be considered to have assumed or succeeded to any liabilities of the impaired insurer, and *shall not be considered to otherwise stand in the shoes of the impaired insurer for any purpose, including the issue of whether the association is amenable to the personal jurisdiction of the courts of any other state.* (emphasis added)

**13.** While the guaranty association in the *Ramsey* case had more direct contact with the forum than the IGAs in this action, the court's decision was not based on those contacts. Instead, the Court found jurisdiction based on (1) the presence of a "covered claim"; (2) the association's guaranteeing of its members obligations in the forum state; and (3) the fact that association funds are derived, in part from premiums collected in exchange for insuring out-of-state risks. 922 P.2d at 242. These factors are also present in this action.

As the court noted, "[t]he only relationship between this lawsuit and Texas arises out of the Boy Scouts' role as risk manager for the Pennsylvania councils" and "[a]ccordingly, Texas's interest in the lawsuit against Pennsylvania Guaranty is minimal." *Id.* In contrast, this case has substantial connections to Texas. While this action encompasses asbestos-related claims asserted throughout the United States, the largest number of claims have been brought in Texas. Moreover, GE has substantial operations in Texas and does a large volume of business in Texas. Hence, unlike *Boy Scouts*, this suit involves a plaintiff with a meaningful Texas presence seeking coverage for claims that have been brought, largely, in Texas.

Further, the *Boy Scouts* case involved an action by two insureds seeking coverage from their respective IGAs—specifically, one Texas insured sought coverage from the Texas IGA and one Pennsylvania insured sought coverage from the Pennsylvania IGA. The court's ruling, therefore, simply required the Pennsylvania insured to bring its case in Pennsylvania. Here, the operative facts and the resulting harm mandate a different result. In this case, GE has sought coverage from seven geographically dispersed guaranty associations (and anticipates the need to pursue claims against guaranty associations in other states where "covered claims" exist). Upholding the special appearances here requires GE to file multiple lawsuits in numerous courts, literally, across the country. This results in an enormous waste of judicial resources, subjects GE to inconsistent judgments, and effectively precludes GE from seeking recovery from these various state insurance guaranty associations due to the prohibitive financial burden associated with such a ruling.

For the reasons stated, I would reverse the orders granting the special appearances and remand for a trial on the merits.